UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERRY W. WILLIAMSON,

       Plaintiff,

v.

                                  Case No. 05-70654
                                  (Consolidated with Case No. 05-73093)

LEAR CORPORATION                Honorable Patrick J. Duggan

       Defendant.

_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 28, 2005.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                 U.S. DISTRICT COURT JUDGE

These consolidated lawsuits alleging age and disability discrimination and retaliation arise from Plaintiff Jerry Williamson's employment at and termination from Defendant Lear Corporation ("Lear"). Presently before the Court is Lear's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, filed November 15, 2005. Plaintiff Jerry Williamson ("Williamson") filed a response to Defendant's motion on December 6, 2005. On December 16, 2005, the Court issued a Notice informing the parties that it is dispensing with oral argument with respect to Lear's motion in accordance with Local Rule 7.1(e)(2).

## I.      Factual and Procedural Background

In July 1987, Lear hired Williamson, born October 15, 1947, to work at its Romulus II facility in Romulus, Michigan.  Initially Williamson worked as a security guard, but he subsequently worked as a maintenance technician and eventually as a production worker.  In all of these positions, Williamson was a member of the United Auto Workers Local 174 ("UAW") and the terms and conditions of his employment were governed by a collective bargaining agreement ("CBA") between the UAW and Lear.

In approximately 1993, Williamson suffered a lower back injury.  After Williamson underwent surgery for this injury, his physician issued permanent lifting restrictions which have been reissued in the same form over the years.  These restrictions permit Williamson to lift up to twenty-five pounds frequently and to lift twenty-five to fifty pounds occasionally.  Williamson does not dispute Lear's assertion that it has accommodated Williamson's lifting restrictions with respect to his permanent work assignments.

In August 2002, Lear closed its Romulus II facility and Williamson was laid-off. Williamson subsequently was re-hired to work at Lear's Romulus I facility, where Lear manufactures front and rear seats.  Romulus II employees re-hired to work at the Romulus I facility essentially were treated as new hires and thus they lost their prior plant seniority.

In April 2003, the Romulus I facility underwent an economic reduction in force that resulted in the elimination of several positions, including the position Williamson held.  When many of Williamson's co-workers were recalled in June 2003, but he was

2

not, Williamson filed a grievance with the UAW.  Williamson also filed a charge with the

Equal Employment Opportunity Commission ("EEOC") on December 10, 2003, alleging

that he was not recalled due to his age and disability.  *See* Mot. Ex. 2.  In a "Notice of

Right to Sue" mailed on February 10, 2004, the EEOC informed Williamson that it was

closing his case and that he had ninety days from receipt of the notice to file a lawsuit in

state or federal court or his "right to sue based on the above-numbered charge will be

lost."  *See id*.  Williamson acknowledges receiving the EEOC's right-to-sue letter

sometime in February 2004.  *See* Mot. Ex. A at 69.

In February 2004, Williamson was recalled to the Romulus I facility and his UAW

grievance subsequently was settled for $9,000.  Believing that Lear breached the CBA

with respect to the recall, however, Williamson and more than one hundred and sixty

other Lear employees filed a lawsuit in federal court on October 13, 2004. *See Williamson*

*et al. v. Lear Corp.*, Case No. 04-74010 (E.D. Mich).  That case was assigned to the

Honorable Lawrence P. Zatkoff who, on June 8, 2005, granted a motion for summary

judgment filed by Lear and dismissed the complaint.

Williamson claims that after he was recalled to the Romulus I facility, supervisors

required him to work on several occasions in positions that violated his lifting restrictions.

In his deposition, Williamson specifically identified these incidents as occurring on April

18 and 25, May 10, July 2, 2004, and on January 23, 2005.  *See* Mot. Ex. 1 at 138-67.

With respect to the April 18, 2004 incident, Williamson alleges that his supervisor

Matt Hampton ("Hampton") indicated that "something happened" and he needed

3

Williamson to report to the end of the assembly line to pick-up seats. *See* Mot. Ex. A at 138-47  According to Williamson, he and another employee were responsible for lifting seats weighing "60 or 70 pounds" for a few hours. *See id*. at 143.  While generally this job is performed with the assistance of a lift, Williamson testified that the seats were coming off the line at a point where the lift could not be used. *See id*. at 143-44.  He further testified that he and the other employee were not able to lift the seats together because they were coming off the line too quickly. *See id.*  The following shift, Williamson returned to his prior duties. *See id*. at 143.

On April 25, 2004, Hampton again asked Williamson to leave his assigned duties in order to fill another position– placing headrests onto the body of seats. *See id*. at 148. While the headrests weighed less than two pounds, Williamson claims there was a problem with the guide posts of the headrests that made their insertion or removal difficult. *See id*. at 150 & 148-49.  Williams testified that removal of the headrests required "maybe 100 pounds of pressure." *See id*. at 151.  Williamson worked in this position for approximately two and a half hours. *See id*. at 151.

Williamson again was assigned to a temporary position that he claims violated his work restrictions on May 10, 2004.  On that date, due to difficulties with employee attendance, Dawn Werner assigned Williamson to "DR front seat finals" and assigned a younger employee, Howard Jones, to Williamson's position. *See id*. at 106-113. Williamson concedes that Jones could not perform the DR front seat finals job because he was on probation. *See id*. at 111-12.  Williamson returned to his regular work assignment

4

the following shift. *See id*. at 110.

On May 19, 2004, Williamson filed an EEOC charge. *See* Mot. Ex. 5. In this charge, Williamson claims that Lear refused to honor his medical restrictions on April 18 and 25, and May 3 and 10, 2004, in retaliation for filing his previous EEOC charge on December 10, 2003.[1] *See id*. While Williamson only checked the "retaliation" box on the EEOC charge form, he states that Lear discriminated against him on those dates due to his age and disability. Williamson provides: "I believe that I was denied a reasonable accommodation in retaliation for filing the above charge, in violation of the [ADEA] . . . and Title I of the [ADA] . . ." *See id*. Williamson further states that a younger, probationary employee was given his regular position during these re-assignments. *See id*. The EEOC mailed a right-to-sue letter to Williamson on July 1, 2004, indicating that the EEOC was closing the case and that Williamson must file a lawsuit within 90 days of receipt of the notice or his right to sue will be lost. *See id*. Williamson acknowledges receiving this notice sometime in July 2004. *See* Mot. Ex. 1 at 75.

In July 2004, Lear relocated the operations of the Romulus I facility to its Romulus II plant. On July 2, 2004, Lear superintendent Larry Eason asked Williamson to perform rear seat steaming duties– a job that Williamson claims also violated his work restrictions. *See id*. at 155. This job required Williamson to lift a seat, set it on a table, steam and finesse the seat, and then set the seat back onto the assembly line. *See id*. at 158. Rear

---

[1]Although this EEOC charge refers to an incident on May 3, 2004, the parties have not provided the Court with details of an incident on that date.

5

seat steaming was a position specifically listed as a position complying with Williamson's

job restrictions, *see* Mot. Ex. 4; but Williamson claims the position was listed based on

how it was performed in Romulus I where the seats did not have to be lifted off the

conveyer belt for steaming.  *See id*. Ex. 1 at 159-61.  Williamson also testified, however,

that each seat only weighs about 15 pounds.  *See id*. at 158.

Williamson did not file an EEOC charge with respect to the July 2 incident,

although on August 11, 2004, he filed a grievance with the National Labor Relations

Board ("NLRB") in which he referred to this incident.  *See* Mot. Ex. 6.  In his NLRB

grievance, Williamson alleged that the UAW refused to file grievances on his behalf with

respect to Lear's violations of his job restrictions.  *See id*.  The NLRB dismissed the

charge on September 28, 2004, finding with respect to the July 2 incident that

"Williamson's assertion that the July 2 assignment was improper is contradicted by

evidence furnished by both the Employer and Union that the assignment was among those

expressly identified to comply with his medical restrictions."  *See id*.

On October 14, 2004, Williamson filed an EEOC charge alleging age and

disability discrimination and retaliation.  *See* Resp. at 40.  On the charge form,

Williamson identifies the date the discrimination took place as August 24, 2004.  *See id*.

On November 19, 2004, the EEOC mailed a right-to-sue letter to Williamson, indicating

that it was closing the case.  *See id*. at 41.

On January 23, 2005, Williamson's supervisor Ken Kolb ("Kolb") asked

Williamson for assistance getting a seat "unstuck" from the assembly line.  *See* Mot. Ex.

6

1 at 164-66.  In the process of assisting Kolb, Williamson injured his back.  *See id*.

Williamson nevertheless returned to work after the incident and worked through the first

week of February 2005.  *See id*. at 166-67.

On February 6, 7, and 8, however, Williamson was absent from work.  *See id*.  On

those occasions, he followed Lear's procedures for reporting absences on the company's

"Attendance Tracking System."  *See* Mot. Ex. 13 and Ex. 14.  Williamson continued to be

absent from work from February 9 through 18; however, on those dates he failed to call

the Attendance Tracking System, otherwise contact Lear, or provide Lear with any

medical documentation regarding those absences.  *See id*.

Pursuant to the CBA between the UAW and Lear, an employee "shall be

terminated . . . if . . . (3) The employee is absent for three (3) consecutive work days

without notification to the Company and without a justifiable reason for absence."  *See*

Mot. Ex. 7 Art. 5 § 17.  The collective bargaining agreement further provides the

following with regard to medical leave of absence:

> An employee who is absent from work, because of illness,
> injury or disability, for a period in excess of three (3) working
> days, and who submits satisfactory medical evidence to the
> Company to show that he or she is unable to work because of
> such illness, injury, or disability, shall be granted a medical
> leave of absence, upon application on a form provided by the
> Company.  In the event of a request for a medical leave of
> absence, the employee must provide the Company with a
> written statement signed by a physician indicating:
>
> (A)     The date on which the medical leave of absence is
>         expected to begin;

7

    (B)     The date on which it is expected that the medical leave of absence will terminate  if the doctor can provide same; and

    (C)     The medical basis for the leave of absence.

*See id*. Art. 13 § 1.  Rule 5 of the "Shop Rules" for the Romulus I facility further lists failure to notify Lear of an absence prior to the start of the employee's shift as an infraction that "will be sufficient grounds for disciplinary action ranging from verbal warning up to and including termination . . ."  *See id*. Ex. 8.

On February 18, 2005, after Williamson was absent for ten days without notifying Lear, its Human Resources Manager Richard Wong ("Wong") sent Williamson a termination letter.  *See id*. Ex. 10.  In the letter, Wong states that Lear is terminating Williamson, effective February 18, 2005, because he has not called the company "at any time since February 9, 2005 to report the necessity for your time off, request approval for any of your time off, nor have you provided any documentation to substantiate your necessity for time off as required by the Shop Rules as well as the Labor Agreement." *See id*.  Williamson retrieved Lear's termination letter from the post office on February 22, 2005.  *See* Mot. Ex. 1 at 52.

In the meantime, on February 18, Williamson had filed a complaint in this Court alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, and disability discrimination in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101-12213.  *Williamson v. Lear*, Case No. 05-70654 (the "first lawsuit").  After receiving Lear's termination letter,

8

Williamson filed a second complaint in this Court alleging retaliation in violation of the ADEA and ADA.  *Williamson v. Lear*, Case No. 05-73093 (the "second lawsuit"). Pursuant to an order issued on September 2, 2005, both cases were consolidated before this Court.

## II.   Applicable Law and Analysis

### A.   Discrimination

Lear seeks summary judgment with respect to Williamson's age discrimination and disability claims, contending *inter alia* that those claims are time-barred because Williamson failed to file his first lawsuit within ninety days of receiving the EEOC's right-to-sue letters or because he failed to file a timely EEOC charge with respect to the alleged incident of discrimination.

Under the ADA and ADEA, before filing a complaint in the district court, a plaintiff must exhaust his or her administrative remedies by filing a charge of discrimination with the EEOC or the appropriate state agency.  *See* 42 U.S.C. § 12117(a) (incorporating by reference the enforcement mechanisms set out in Title VII of the Civil Rights Act of 1964 for ADA claims); 42 U.S.C. § 2000e-5 (setting forth Title VII requirements); 42 U.S.C. § 626(d) (setting forth ADEA's requirements);   The plaintiff's EEOC charge must be filed within 180 days of the alleged discriminatory acts, or within 300 days if the charge is first filed with a state agency.  *See id*. The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Jones v. Sumser Ret. Vill*., 209 F.3d 851, 853 (6th Cir. 2000).

If the EEOC issues a right-to-sue letter to the plaintiff, the plaintiff must file suit in state or federal court within ninety days; a complaint filed beyond this period is time-barred. *See* 42 U.S.C. § 2000e-5(f)(1); *Peete v. Am. Std. Graphic*, 885 F.2d 331, 331-32 (6th Cir. 1989).

In his first lawsuit, Williamson claims age and disability discrimination but he fails to allege any specific acts to support his claims.  It appears to the Court, however, based on Lear's motion, Williamson's deposition testimony, and the EEOC charges Williamson attached to his complaint, that his age and disability discrimination claims are premised upon Lear's failure to recall him in June 2003, and on Lear's assigning him to jobs which he alleges violated his medical restrictions on the following dates: 4/18/04; 4/25/04; 5/10/04; 7/2/04; and 1/23/05.

As set forth above, Williamson filed EEOC charges based on most of those incidents.  On December 10, 2003, he filed a charge alleging age and disability discrimination based on Lear's failure to recall him in June 2003.  *See* Mot. Ex. 2.  On February 2, 2004, the EEOC mailed a right-to-sue letter with respect to that filing.  *See id*. On May 19, 2004, Williamson filed an EEOC charge alleging retaliation for filing the earlier charge, as well as age and disability discrimination.  *See id*. Ex. 5.  The EEOC mailed a right-to-sue letter to Williamson with respect this charge on July 1, 2004.  *See id*.  Williamson did not file his first lawsuit within ninety days of his receipt of the EEOC's right-to-sue letters.  The Court therefore concludes that his claims based on the June 2003 recall or his assignments on April 18 and 25 and May 3 and 10, 2004– the

10

incidents specifically described in those charges– are time-barred.

In response to Lear's motion for summary judgment, Williamson argues that he timely filed suit in federal court because he "cancelled" his previous charges with the EEOC and filed a new EEOC charge on October 14, 2004.  *See* Resp. at 1.  The EEOC mailed a right-to-sue letter to Williamson with respect to that charge on November 19, 2004; and Williamson thereafter filed his lawsuit within ninety days– that is on February 18, 2005.  The Court believes, however, that the statutes' ninety day filing requirement would be rendered meaningless if a plaintiff could– as Williamson asserts– avoid the deadline simply by re-filing his or her claims in a later charge.

As to his claims of discrimination based on the incidents occurring on July 2, 2004 and January 23, 2005, the Court concludes that Williamson has failed to exhaust his administrative remedies by first filing an EEOC charge complaining about discrimination with respect to those incidents. While Williamson filed a complaint with the NLRB with regard to the July 2, 2004 incident, it does not appear that he included this incident in any of his EEOC charges.  While Williamson's October 14, 2004 EEOC charge was filed within 180 days of the July 2 incident, he identifies the date of discrimination in that charge as August 24, 2004.  Additionally, he only alleges that Lear denied him a position(s) because of his age and disability– not that Lear *assigned him to* positions violating his work restrictions.[2] As to the incident on January 23, 2005, there is no

---

[2]In describing the particulars of his charge, Williamson wrote in part:
I have reason to believe that I have been discriminated against

evidence that Williamson ever filed an EEOC charge after that date.  But even if Williamson complied with the statutory filing requirements with respect to his discrimination claims, the Court still finds that Lear is entitled to summary judgment.

Williamson identifies two incidents of age discrimination: (1) Lear's failure to recall him from the layoff in April 2003; and (2) the incident on May 10, 2004, when he was asked to perform the DR front seat finals position and a younger employee filled his usual position.  *See* Mot. Ex. 1 at 94-113.  With respect to the 2003 layoff, Williamson presents no evidence to suggest that he was treated differently than similarly-situated younger employees.[3]  With respect to the May 10 incident, Williamson cannot establish that this temporary job assignment constituted a materially adverse employment action, as he suffered no loss in benefits, title, or responsibility.  *See Kocsis v. Multi-Care Mgmt, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996)(describing adverse employment actions).  Furthermore, while Williamson believes this incident constituted age discrimination

---

> on the basis of my age (56) and disability.  I also believe that I have been retaliated against for filing previous charges of discrimination.  I believe that I have been harassed by my supervisor because of my condition.  I believe that position for which I should have been assigned to because of my condition was given to another individual who is younger than myself.

*See* Resp. at 40.

[3]Williamson identifies only one employee who he believes should not have been rehired or recalled before him– Byron Culver.  *See* Mot. Ex. 1 at 95-96.  While Culver was younger than Williamson, there is no dispute that Culver was hired to perform direct duties– duties Williamson concedes he could not perform due to his medical restrictions. *See id*. 98 and 134-37.

12

because a younger employee temporarily filled his duties, *see* Mot. Ex. 1 at 110-112, he

concedes that Lear had a legitimate, non-discriminatory reason for assigning Williamson

to the temporary job while the younger employee filled his position.  Specifically,

Williamson acknowledges that the younger employee was a probationary employee who

was not permitted to work in the position Williamson was asked to perform.  *See id.*

As to his disability discrimination claim, Williamson fails to demonstrate that he is

an individual with a disability.  "Merely having an 'impairment' does not make one

disabled for purposes of the ADA."  *Toyota Motor Mfg., Kentucky Inc. v. Williams*, 534

U.S. 184, 195, 122 S. Ct. 681, 690 (2002).  The plaintiff also must demonstrate that the

impairment "limits a major life activity" and that the limitation is "substantial."  *Id.*

(citing 42 U.S.C. § 12102(2)(A)).  Pursuant to Sixth Circuit precedent, a lifting

restriction– in and of itself– does not constitute a disability under the ADA.  *See McKay

v. Toyota Motor Mfg, USA, Inc.*, 110 F.3d 369, (6th Cir. 1997)(holding that the plaintiff's

weight lifting restrictions due to carpal tunnel syndrome are not a disability under the

ADA where there was no evidence that the condition restricted the plaintiff from

performing a broad class of jobs or any other major life activity); *Gerton v. Verizon South

Inc.*, 145 Fed. Appx. 159, 165-66 (6th Cir. 2005)(unpublished op.)(same); *Gayer v.

Continental Airlines, Inc.*, 21 Fed. Appx. 347, 350 (6th Cir. 2001)(unpublished

op.)(holding that the plaintiff's inability to lift over 40 pounds did not, alone, render her

disabled); *Law v. City of Scottsville*, No. 98-6335, 2000 WL 799742, at * (6th Cir. June

15, 2000)(unpublished op.)(holding that the plaintiff, who was under a forty pound lifting

13

restriction, was not disabled as defined by the ADA).[4]  Williamson concedes that his lifting restriction due to his back injury does not impair his ability to work.  *See* Mot. Ex. 1 at 119.  There is no evidence that his back injury otherwise substantially impairs him from engaging in a major life activity.

The Court therefore concludes that Lear is entitled to summary judgment with respect to Williamson's age and disability discrimination claims.

**B.      Retaliation**

In order to establish his retaliation claim under the ADA or ADEA, Williamson must demonstrate that: (1) he engaged in protected activity; (2) Lear took an adverse employment action against him; and (3) there was a causal connection between the protected activity and the adverse employment action.  *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).  If Williamson establishes a *prima facie* case of retaliation, a presumption of retaliation arises.  Lear can rebut this presumption by setting forth a legitimate, non-discriminatory reason for the adverse employment action.  *Weigel*, 302 F.3d at 381; *Penny*, 128 F.3d at 417.  Williamson then must present evidence to show that Lear's proffered reason was a mere pretext for discrimination.  *Id.*

Williamson's retaliation claim in the second lawsuit is premised on his termination.  *See* Mot. Ex. 1 at 170.  Williamson believes he was discharged on February

---

[4]These unpublished opinions are attached as Exhibit A to this Opinion and Order.

18, 2005, in retaliation for his prior complaints of age and disability discrimination and his federal lawsuits. Lear contends that it is entitled to summary judgment with respect to Williamson's claim of retaliation because there is no causal connection between his alleged protected activities and his discharge. Lear further argues that it had legitimate, non-discriminatory reasons for Williamson's discharge that he cannot rebut.

The Court agrees that even if Williamson can establish a prima facie case of retaliation, Lear articulates a legitimate, non-discriminatory reason for terminating him that Williamson fails to rebut. The undisputed evidence establishes that Williamson failed to report to work from February 9 through 18, 2005, without notifying Lear or providing Lear with sufficient medical documentation concerning his absence. The undisputed evidence further establishes that this violated Lear's Shop Rules, as well as the CBA governing Williamson's employment.

To demonstrate that Lear's reason for terminating him was pretextual, Williamson states in his response that he believed Lear had been informed of the reason for his absence through his workmen's compensation claim adjuster. *See* Resp. at II-III (citing Ex. 2006). The evidence he presents to support this contention, however, is a notice from Michigan's Worker's Compensation Agency dated January 19, 2005. *See* Ex. 2006. As Williamson returned to work after that date, the Court cannot understand how this notice informed Lear as to why Williamson subsequently failed to report to work.

Williamson further argues that he presented medical documentation to Lear after he received Wong's termination letter. *See id.* at III (citing Dep. Ex. 8 at p. 44 of Resp.).

15

Not only was this doctor's note presented to Lear after it made the decision to terminate Williamson, but Williamson's doctor merely states: "[patient] has been off work since 2/7/05 . . . He remains off work." *See* Resp. at 44. As Lear argues, this note did not provide the information necessary to excuse Williamson's absence. *See* Mot. Ex. 7 at Art. 13 § 1.

Finally to demonstrate pretext, Williamson asserts that he was told by another Lear employee that, on June 16, 2005, Wong was on the production floor discussing Williamson and Judge Zatkoff's dismissal of the breach of contract case against Lear. *See* Resp. at VI (citing Ex. 2012 at p. 46 of Resp.). This evidence, however, is insufficient to demonstrate that Lear's decision to terminate Williamson almost four months earlier was based on that lawsuit.

The Court therefore concludes that Williamson fails to present evidence to rebut Lear's legitimate, non-discriminatory reason for terminating him. The Court thus holds that Lear is entitled to summary judgment with respect to Williamson's retaliation claim.

Accordingly,

**IT IS ORDERED**, that Defendant's Motion for Summary Judgment is **GRANTED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Jerry Williamson
Maurice Jenkins

16

# EXHIBIT A

*Westlaw.*

145 Fed.Appx. 159                                                                    Page 18
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR
P 7
**(Cite as: 145 Fed.Appx. 159)**

**C**
Briefs and Other Related Documents

2005 FED APP. 0725P.This case was not selected for publication in the Federal Reporter.NOT RECOMMENDED FOR FULL--TEXT PUBLICATION Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.  Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)
United States Court of Appeals,Sixth Circuit.
Wanda GERTON, Plaintiff-Appellant,
v.
VERIZON SOUTH INC., Defendant-Appellee.
**No. 03-6674.**

Aug. 18, 2005.

**Background:**  Employee sued employer and a supervisor, alleging, inter alia, disability discrimination in violation of Kentucky's Civil Rights Act. Defendants removed the action from state court. The United States District Court for the Eastern District of Kentucky granted employer's motion for summary judgment, and the employee appealed.

**Holdings:** The Court of Appeals, Hood, District Judge for the Eastern District of Michigan, sitting by designation, held that:

1(1) employee's wrist condition did not qualify as a "disability," and

2(2) in any event, employer provided her the only accommodation she ever specifically requested.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⇐1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled;  What Is Disability
                78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases
Employee's wrist condition did not qualify as a "disability" under the Americans with Disabilities Act (ADA), despite claim that the impairment substantially limited her major life activities of lifting, performing manual tasks and working; any inability to lift more than 5 or 10 pounds was not shown to limit her ability to lift anything else she required in her daily life outside work, she pointed to no evidence, other than by inference, that she was unable to care for herself or to perform any household tasks or any activities that were of central importance to her daily life, and she did not show she was unable to perform a substantial class or broad range of jobs. Americans with Disabilities Act of 1990, §§ 3(2)(a), 102(b)(5)(A), 42 U.S.C.A. §§ 12102(2)(A), 12112(b)(5)(A); 45 C.F.R. § 84.3(j)(2)(ii); 29 C.F.R. § 1630.2(i).

**[2] Civil Rights 78 ⇐1225(4)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1225 Accommodations
                78k1225(4) k. Requesting and Choosing Accommodations;  Interactive Process;  Cooperation. Most Cited Cases
Even if employee were disabled, employer provided her the only accommodation she ever specifically requested, thus defeating any claim under the Americans with Disabilities Act (ADA), despite her

18

145 Fed.Appx. 159                                                                   Page 19
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR
P 7
**(Cite as: 145 Fed.Appx. 159)**

assertion that employer had to "immediately" act on an accommodation request; she failed to show that any delay in her request for accommodation was unreasonable. Americans with Disabilities Act of 1990, § 2, 42 U.S.C.A. § 12101.

**\*160** On Appeal from the United States District Court for the Eastern District of Kentucky.

Linda B. Sullivan, Lexington, KY, for Plaintiff-Appellant.
Matthew W. Lampe, Jeffrey D. Winchester, Jones Day, Columbus, OH, for Defendant-Appellee.

Before COLE and CLAY, Circuit Judges; and HOOD, District Judge. FN*

> FN* The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

OPINION

HOOD, District Judge.
**\*\*1** Plaintiff-Appellant Wanda Gerton appeals the district court's order granting summary judgment in favor of Defendant-Appellee Verizon South, Inc., a wholly-owned indirect subsidiary of Verizon Communications Inc. ("Verizon") on Gerton's disability discrimination claim.   The district court found that Gerton was not disabled, and, even if Gerton were disabled, Verizon provided a reasonable accommodation to Gerton.   For the reasons set forth below, we affirm the district court's decision.

I.

Gerton began working for General Telephone and Electric Corporation ("GTE") in 1975, as an hourly Directory Assistance Operator.   GTE later merged with Bell Atlantic Corporation to form Verizon.   Gerton worked as an operator for 26 years, **\*161** at the company's Lexington, Kentucky Operator Center.   The

Operator Center was divided into two departments: Directory Assistance ("DA") and Toll Operations.   DA Operators find telephone numbers by typing in names and addresses on a full keyboard computer, whereas Toll Operators handle collect calls by typing in the numbers using the computer number pad.   During her career, Gerton worked as both a DA and Toll Operator.

In November of 2000, Gerton was diagnosed with "carpal tunnel issues" but could still perform her job as a DA Operator.   (J.A. 402).   On March 19, 2001, her right arm started tingling, became numb, and "just [went] completely out."   (J.A. 403) The next day, March 20, 2001, Verizon sent Gerton to MedWorks, Verizon's medical provider for employees with work related injuries.   (J.A. 406) Gerton was told by her supervisor, Barbara Anderson, that Gerton could not go to her primary physician.   (J.A. 405, 407) She was seen at MedWorks by Beth Jones, a Physician's Assistant.   Gerton was diagnosed with bilateral carpal tunnel syndrome, right hand greater than the left hand.   (J.A. 490, 492) Jones approved Gerton to return to work with the following restrictions:   a 10 pound weight restriction;   no use of right hand;   a 5 minute break every hour;   and change "to toll for now (off DA)." (J.A. 492) FN1 Gerton brought her restrictions to work that day.   Anderson told Gerton that she would not be transferred to Toll but to work the DA Operator position with only one hand, with hourly breaks.   (J.A. 408, 417) Anderson called MedWorks for more information regarding Gerton's restrictions and to see how long the restrictions were to last.   (J.A. 494)

> FN1. It appears the form outlining restrictions was signed by both Beth Jones and Dr. Marguerite Mueller.

On March 23, 2001, Gerton returned to MedWorks and saw Marguerite Mueller, M.D. (J.A. 493-94) Dr. Mueller referred Gerton to a specialist, Dr. Einbecker, for an appointment on May 10, 2001.   In the meantime, Dr. Mueller approved Gerton to return to work, with the following restrictions:   a 10 pound weight restriction; no use of right hand;   and a 5 to 10 minute break every hour, until cleared by Dr. Einbecker.   (J.A. 491) These

145 Fed.Appx. 159                                                    Page 20
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR
P 7
**(Cite as: 145 Fed.Appx. 159)**

restrictions did not require that Gerton be transferred to Toll Operations.

Gerton returned to MedWorks on March 29, 2001 and was seen by Dr. Mueller. (J.A. 492) Gerton was experiencing increasing pain in her left hand as a result of the one-handed duty restriction. (J.A. 425) Dr. Mueller diagnosed Gerton with bilateral carpal tunnel syndrome, right greater than left, and chronic tendonitis. (J.A. 492) Dr. Mueller's examination found that Gerton was "intact to light touch on the left." (J.A. 496) Gerton was returned to work with restrictions of 5 pounds, one-handed duty and 10 minute stretch breaks every hour. (J.A. 492) Dr. Mueller's notes indicate that although Gerton should continue with single-handed duty, she may have to alternate her hands. (J.A. 496)

**2** In late April 2001, Gerton was temporarily transferred to Toll, which she had requested as an accommodation. (J.A. 186-87, 410) Gerton was able to perform her duties with one hand while working in Toll Operations. (J.A. 187)

Verizon contends that one of its supervisors, Judy Perkins, gave Gerton an ADA Accommodation Request Form at Gerton's request on July 11, 2001. (J.A. 179-80) Gerton does not recall if she received the form. (J.A. 191) Perkins sent an e-mail to Lexington Operator Center management **\*162** on July 13, 2001 explaining that Gerton had requested an ADA accommodation to remain in Toll and asking that Gerton be left in the temporary Toll assignment until a decision from the ADA group was received. (J.A. 569) Gerton had not submitted supporting documents and, on August 14, 2001, Perkins sent an e-mail to Lexington Operator Center management asking if Gerton should be moved back to her DA position. (J.A. 302) On August 22, 2001, Perkins provided Gerton with another Job Modification Form instructing Gerton to forward the completed form and supporting documents to the Absence Management Department within one week. (J.A. 296, 302) Gerton submitted the form to her personal physician, W. Travis Lawson, M.D. (J.A. 262) As of September 4, 2001, Verizon had still not received the required form and documentation. (J.A. 302)

On September 10, 2001, Gerton was transferred back to DA because Verizon had not received the form and supporting medical documents. (J.A. 64, 144, 187, 201-02, 296) Anderson told Gerton that because her condition was not work-related, she would have to go back to DA. (J.A. 188) At that time, Gerton was given an information booklet about the ADA. (J.A. 189-90) Gerton claims that Verizon never told her that it was moving her back to DA because the medical documentation of her condition was insufficient. (J.A. 438) Cynthia Reber, a nurse for Verizon's Absence Management Group, received the Job Modification Form signed by Gerton's physician on September 10 but with no records to substantiate the request. (J.A. 500) After Gerton called her physician's office on the afternoon of September 10, 2001, the signed Job Modification Form and medical documentation was faxed to Verizon's Absence Management Department. (J.A. 147, 192, 199-200, 262, 313, 316) Unaware that the records had been faxed to Verizon on September 10, 2001, Perkins e-mailed Reber on September 12, 2001 indicating that due to the chaos of September 11, she was unable to contact Gerton to advise her that her medical records had not been received and gave Gerton an extension until September 21, 2001. (J.A. 501)

On September 13, 2001, William Kammeyer, M.D., a physician retained by Verizon, reviewed the paperwork received by Verizon from Gerton's personal physician, Dr. Lawson, and conferred with Dr. Lawson about Gerton's wrist condition. (J.A. 313, 319) Dr. Kammeyer thereafter recommended to Reber that Gerton's accommodation request be granted. (J.A. 313, 319) Reber forwarded to Verizon's ADA Group the Absence Management Department's recommendation that the request be granted. (J.A. 313, 323) The Verizon ADA Group processed Gerton's accommodation request and notified Perkins on September 20, 2001 that Gerton's request for permanent assignment to Toll had been approved as an accommodation of her right wrist carpal tunnel syndrome. (J.A. 296, 306) Perkins notified Gerton's supervisor on September 21, 2001 that the permanent transfer had been approved. (J.A. 296)

**3** Gerton claims that she worked on September 21,

145 Fed.Appx. 159                                                                                    Page 21
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR
P 7
**(Cite as: 145 Fed.Appx. 159)**

but was never told that her accommodation request to be assigned permanently to Toll had been granted. (J.A. 446) The last day Gerton was at work was on September 21, when she "just couldn't bear it anymore." (J.A. 448, 451) Gerton claims her "hand wouldn't do it." (J.A. 451) Gerton was scheduled to begin her permanent assignment to the Toll Department effective September 25, 2001. (J.A. 65, 296) Gerton did not report for work on September 25, 2001, and did not report thereafter. (J.A. 452) Prior to September 10, Gerton felt that she was capable of doing the Toll job. (J.A. 156) Gerton claims that her left hand worsened between**163** September 10 and September 25 to such an extent that she could no longer perform either of the DA or Toll Operator positions. (J.A. 440)

Wanda Corman, a Toll Department Supervisor, called Gerton at home while she was off from work to let her know that she had been transferred to Toll. (J.A. 142) Gerton did not return to work to do the Toll job because she could no longer perform the Toll job. (J.A. 156) Gerton remained off work on paid sick leave, and, after her paid sick leave ran out, remained on personal leave until June 14, 2002, when her personal leave ran out. (J.A. 267) Based on the Personal Leave of Absence policy, the effective date of her termination was December 15, 2001, the last day Gerton was paid. (J.A. 267)

On May, 22, 2002, Gerton filed a complaint in the Circuit Court of Fayette County, Kentucky, naming Verizon and Perkins as defendants. Gerton claimed Verizon discriminated against her due to a disability, in violation of Kentucky's Civil Rights Act, Ky.Rev.Stat. § 344 *et seq.* Against Perkins, Gerton claimed intentional infliction of emotional distress. Defendants removed the matter to the Eastern District of Kentucky, stating that the district court had subject matter jurisdiction because Perkins had been fraudulently joined in order to avoid subject matter jurisdiction by the federal courts. Gerton filed a motion to remand which the district court denied, finding that Gerton failed to state a cognizable intentional infliction of emotional distress claim under Kentucky law against Perkins. The parties thereafter stipulated to dismiss the intentional infliction of emotional distress claim against

Perkins, with prejudice. Verizon filed a motion for summary judgment on the remaining disability discrimination claim, which the district court granted. Gerton timely filed a notice of appeal.

II.

**A. Standard of Review**

A district court's order granting summary judgment is reviewed *de novo.* *Kiphart v. Saturn Corp.,* 251 F.3d 573, 581 (6th Cir.2001); *Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir.1998). Fed.R.Civ.P. 56(c) provides that summary judgment be entered only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if the "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed. 265 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.,* 477 U.S. at 322-23, 106 S.Ct. 2548. A court must look to the substantive law to **164** identify which facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

145 Fed.Appx. 159                                                                              Page 22
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR P 7
**(Cite as: 145 Fed.Appx. 159)**

### B. Americans with Disabilities Act

#### 1. *Prima Facie* Case

**\*\*4** [1] On appeal, Gerton claims the district court erred in granting summary judgment because she has presented sufficient evidence that her disability substantially limited a major life activity and Verizon failed to reasonably accommodate her wrist condition during two time periods, from March 19, 2001 through April 26, 2001, and, from September 10, 2001 until September 25, 2001. (Appellant's Brief, p. 26) Gerton does not challenge the district court's ruling that, after September 25, 2001, Gerton failed to demonstrate a viable claim of disability discrimination based on Gerton's inability to use either hand, because Gerton did not request any specific accommodation for work without using either hand.

Gerton claims Verizon violated the Kentucky's Civil Rights Act, Ky.Rev.Stat. § 344 *et seq.,* in failing to accommodate her disability. Because the language of the Kentucky Civil Rights Act mirrors the language of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* ADA jurisprudence may be relied upon to analyze disability discrimination claims brought under Kentucky Law. *See Brohm v. JH Properties, Inc.,* 149 F.3d 517, 520 (6th Cir.1998).

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). In order for Gerton to prevail on an allegation of discrimination by way of failure to accommodate, she must establish a *prima facie* case by showing that: (1) she is disabled; (2) she is otherwise qualified for the position; (3) her employer was aware of her disability; (4) an accommodation was needed, in that a causal relationship existed between the disability and the request for accommodation; and, (5) the employer failed to provide the necessary

accommodation. *Gaines v. Runyon,* 107 F.3d 1171, 1175 (6th Cir.1997) (quoting *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 882-83 (6th Cir.1996)). "Once the plaintiff has presented a *prima facie* case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Gaines,* 107 F.3d at 1176. "If the plaintiff fails to establish a *prima facie* case, it is unnecessary to address the question of reasonable accommodation." *Id.* (citing *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985) (citations omitted)).

Proof of a disability is a threshold requirement to prove a violation of the ADA. *Burns v. Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 253 (6th Cir.2000). A disability, with respect to an individual, is defined within the ADA as "a physical or mental *impairment* that *substantially limits* one or more of the *major life activities* of such individual." 42 U.S.C. § 12102(2)(A) (italics added). "Merely having an 'impairment' does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed. 615 (2002) (internal quotations added). "Substantially limits" has been suggested to mean "considerable" or to "a large degree." *Id.* at 196, 122 S.Ct. 681. "Major life activities" refers to those activities that are of central importance to daily life. *Id.* at 197, 122 S.Ct. 681. Although there is no exhaustive**\*165** list of activities, the Supreme Court has cited to the Rehabilitation Act regulations, which defines major life activities to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii); *Williams,* 534 U.S. at 195, 122 S.Ct. 681. These terms must be interpreted strictly to create a demanding standard for qualifying as disabled. *Id.* The Act requires the existence of a disability to be determined on a case-by-case manner. *Id.* at 198, 122 S.Ct. 681; 42 U.S.C. § 12101(2).

**\*\*5** The parties do not dispute that Gerton's wrist condition qualifies as a physical "impairment" under the statute. Gerton argues on appeal that the

impairment is a "disability" because it substantially limits her major life activities of lifting, performing manual tasks and working. We address each activity below.

### 2. Lifting

The Equal Employment Opportunity Commission's Interpretive Guidance specifically includes "lifting" as a major life activity. 29 C.F.R. pt. 1630, App. § 1630.2(i); see Penny v. UPS, 128 F.3d 408, 414 (6th Cir.1997); see also, Mahon v. Crowell, 295 F.3d 585, 591 (6th Cir.2002). Gerton argues that because a Verizon doctor restricted her from lifting more than 10 lbs. (later 5 lbs.), this is evidence of the "employer's" state of mind that the employer "regarded" Gerton as disabled and that she is disabled since "lifting" is a major life activity, citing Ross v. Campbell Soup Co., 237 F.3d 701 (6th Cir.2001) FN2 and Hayes v. United Parcel Service, 17 Fed.Appx. 317 (6th Cir.2001) (unpublished). (Appellant's Br., pp. 17-18)

> FN2. Although Gerton raised the major life activity of "lifting" in her brief before the district court, Gerton did not raise the "regarding as" argument below. This court need not address arguments not presented to the district court. Fed. R.App. 10(a); United States v. Bonds, 12 F.3d 540, 552 (6th Cir.1993). We note Ross addressed the issue of the "regarded as" theory under the ADA which directs the courts to look to the state of mind of the employer against whom a plaintiff makes a claim. Ross, 237 F.3d at 706. Ross will not be considered since the issue was not raised below.

Gerton analogizes her claim involving "lifting" to a case involving "sitting." She cites Hayes, an unpublished decision, which involved an individual who claimed that his back injury rendered him unable to sit, where "sitting" is a major life activity. Hayes, 17 Fed.Appx. at 320. The district court ruled that the plaintiff was required to compare his ability to sit with

the average person's ability to sit and that he had failed to provide such evidence. The plaintiff in Hayes presented evidence that he participated in an occupation readiness program for four months where he was evaluated and his sitting capability was measured at 20 or 25 minutes. Id. at 320. On appeal, we determined that the plaintiff was not required to present evidence comparing the average person's ability to sit with his own ability to sit, stating, "[c]ommon sense and life experiences will permit finders of fact to determine whether someone who cannot sit for more than this period of time is significantly restricted as compared to the average person." Id. at 321. Gerton argues that because she has presented evidence that she was restricted at work from using her right hand and lifting not more than 5 lbs., she is also unable to perform any lifting activities in her daily life outside work and is therefore disabled based on the major life activity of "lifting."

Hayes is distinguishable. Unlike Hayes, Gerton did not submit any evidence which measured her inability to lift at *166 work, other than Dr. Mueller's restrictions not to lift 5 or 10 lbs. Dr. Mueller restricted Gerton to lifting 10 lbs., and later, 5 lbs., between March 20 and 29, 2001. (J.A. 490-96) The medical records do not show that she was unable to lift more than 5 or 10 lbs., nor do they show that she was required to demonstrate her ability to lift. (J.A. 490-96)

Even if Hayes was applicable, that decision was issued before the Supreme Court's opinion in Williams. In the context of the major life activity of performing "manual tasks," "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." See Williams, 534 U.S. at 200-01, 122 S.Ct. 681; see also, Equal Opportunity Employment Comm'n v. Daimler Chrysler Corp., 111 Fed.Appx. 394, 399 (6th Cir.2004) (unpublished opinion). Gerton points to no evidence that her impairment substantially limited her ability to lift in her daily life outside work. Even if Gerton was unable to lift more than 5 or 10 lbs., she has not presented any evidence to show that the inability to lift this amount

145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR P 7
**(Cite as: 145 Fed.Appx. 159)**

substantially limits her ability to lift anything else she requires in her daily life outside work. Gerton has not submitted sufficient evidence to raise a genuine issue of material fact that her impairment limits her major life activity of lifting.

### 3. Manual Tasks

**\*\*6** "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Williams,* 534 U.S. at 200-01, 122 S.Ct. 681. "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Id.* at 198, 122 S.Ct. 681. In *Williams,* the plaintiff was diagnosed with carpal tunnel syndrome, and, due to her impairment, she could not perform "repetitive work with hands and arms extended at or above shoulder levels for extended periods of time." *Williams,* 534 U.S. at 201, 122 S.Ct. 681 (quotation omitted). Even though the plaintiff's impairment in *Williams* caused her "to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances ... these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Id.* at 202, 122 S.Ct. 681.

Gerton argues that because of the nature of her impairment and her work restriction that she cannot use the right hand and can only lift 5 lbs. with her left hand, one can infer a broader limitation on the major life activity of performing manual tasks, such as the inability to care for herself, or to do all of the variety of tasks central to most people's daily lives, that require the use of two hands. (Appellant's Br., p. 21) As the Supreme Court noted, the ADA did not intend to allow "everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as

disabled." *Williams,* 534 U.S. at 197, 122 S.Ct. 681. Other than by inference, Gerton points to no evidence that she was unable to care for herself or to perform any household tasks or any activities that were of central importance to her daily life in March 2001 or September 2001. Gerton has not submitted any **\*167** evidence to raise a genuine issue of material fact that her impairment substantially limits her ability to perform manual tasks in her daily life outside work.

### 4. Working

Because Gerton is unable to show that her impairment substantially limits her major life activities of lifting and manual tasks, we turn to her claim that she is substantially limited from the major life activity of working.

The major life activity of "working" has been treated as a residual category resorted to only when a complainant cannot show she is substantially impaired in any other, more concrete major life activity. *Mahon,* 295 F.3d at 590 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). An individual is substantially limited in the major life activity of working if the claimant is precluded from more than one type of job, a specialized job, or a particular job of choice. *Mahon,* 295 F.3d at 591 (citing *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139). If jobs utilizing an individual's skills are available, one is not precluded from a substantial class of jobs. *Id.* In order to show that a claimant is precluded from a substantial class or broad range of jobs, courts must compare the claimant's access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in the claimant's geographic vicinity. *Id.*

**\*\*7** Gerton claims Verizon failed to accommodate her on two occasions, after March 19, 2001, and, after September 10, 2001. The question then is whether Gerton was disabled on March 19 and September 10. [FN3] Other than the diagnosis on March 20, 23, and 29, 2001, indicating that Gerton had carpal tunnel syndrome on her right hand, Gerton has not presented

145 Fed.Appx. 159                                                    Page 25
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR
P 7
**(Cite as: 145 Fed.Appx. 159)**

any evidence that she was unable to perform a substantial class or a broad range of jobs in various classes. Gerton specifically admits she was able to perform the Toll Operator position, requested such a transfer, and, was performing fine as a Toll Operator with one hand. (J.A. 186-87, 410) Gerton has only claimed that she was unable to perform the DA Operator position. Even though Gerton continued to perform the DA Operator position from March 19, 2001 through April 26, 2001, she was able to perform the duties of that position, by using her left hand. (J.A. 412) Gerton is unable to show that she was disabled from working on March 19, 2001 because she has not shown that she did not have the ability to perform a substantial class or broad range of jobs.

> FN3. There is evidence on the record which may raise a genuine issue of material fact as to whether Gerton was disabled *after* she failed to return to work on September 25, 2001. (*See* January 13, 2003 Opinion, Order and Award by Kentucky's Department of Workers Claims and Gary A. Shaw's April 28, 2003 Evaluation; J.A. 513-521) Gerton does not challenge on appeal the district court's ruling that she could not prevail on a disability claim after September 25, 2001. Although the Opinion and Evaluation note Gerton was disabled, there is no determination in the Opinion and Evaluation that Gerton was disabled on March 19 and September 10, 2001. Even if this evidence raised a genuine issue of material fact regarding Gerton's disability on March 19 and September 10, 2001, Gerton failed to show that Verizon did not reasonably accommodate her, as more fully discussed below.

As to whether Gerton was disabled on September 10, 2001, Gerton admits that she was working "fine" as a Toll Operator with one hand. (J.A. 187) Gerton was still able to perform the DA Operator position until her last day at work, September 21, 2001. It was not until that day that Gerton "just couldn't bear it anymore" and her **\*168** "hand wouldn't do it." (J.A. 448, 451) Gerton

did not return to work after September 25 because she could no longer perform either the DA or the Toll job. (J.A. 156) Disability claims by Gerton after September 25 are not before this court. As noted above, Gerton does not challenge on appeal the district court's ruling that Gerton failed to demonstrate a viable claim of disability discrimination based on Gerton's inability to use either hand, because Gerton did not request any specific accommodation for work without using either hand.

Gerton claims that given her physical impairment, her education and work experience, she was significantly limited in her ability to pursue employment in any other sector of the economy. Gerton submits the opinion of Gary A. Shaw, a Certified Employment Consultant, to support her claim. (J.A. 520-21) Mr. Shaw opines that considering Gerton's "age, education, limited transferable skills, and physical impairments, it is unlikely that she can successfully compete in the job market today." (J.A. 521) "Employers have shown reluctance to employ workers who cannot fully comply with the job description and who need special concessions, or those who work with the distraction of pain." (J.A. 521) Mr. Shaw's opinion did not compare Gerton's access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in Gerton's geographic vicinity. Gerton has not presented sufficient evidence to raise a genuine issue of material fact that her impairment substantially limited the major life activity of working.

**\*\*8** We affirm the district court's finding that Gerton failed to submit any evidence tending to show that her wrist condition impeded her ability to perform other jobs, and, therefore, is not disabled within the meaning of the ADA.

### 5. Reasonable Accommodation

[2] In a claim for discrimination based on disability, "[if] the plaintiff fails to establish a *prima facie* case, it is unnecessary to address the question of reasonable accommodation." *Gaines,* 107 F.3d at 1176 (citing

21 Fed.Appx. 347                                                          Page 26
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))
**(Cite as: 21 Fed.Appx. 347)**

*Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985)* (citations omitted)). Even if Gerton could show she was disabled, as the district court noted, Gerton does not dispute that Verizon provided her the only accommodation she ever specifically requested. Gerton performed as a Toll Operator from late April 2001 to September 10, 2001, and, Gerton's request to be assigned permanently to Toll was approved on September 20, 2001. Gerton is apparently claiming that Verizon did not reasonably accommodate her because it did not "immediately" move her from the DA Operator position to the Toll Operator position upon her request, specifically, on March 19 and September 10, 2001. Gerton has not cited any authority to support her argument that an employer must "immediately" act on an accommodation request by an employee. We have held that an employee cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control. *See Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 437 (6th Cir.1998)*; see also Selenke v. Med. Imaging of Colorado,* 248 F.3d 1249, 1262 (10th Cir.2001).*

As to the March 19, 2001 date, Verizon waited until the end of April 2001 to move Gerton from the DA Operator position to the Toll Operator position. However, while a DA Operator, Gerton was able to perform the job by using one hand and taking frequent breaks.

**\*169** Regarding the September 10, 2001 claim, Verizon submitted evidence that it was not until later in the afternoon of September 10 that it received the fax from Gerton's personal physician regarding the medical records to support her request. Less than two weeks later, on September 21, 2001, after consultation with Verizon's retained physician, Gerton's personal physician, and the review by the Verizon ADA Group, Gerton's supervisor was notified that her request for transfer to the Toll group was approved. September 21, 2001 was the last date Gerton physically worked at Verizon.

Gerton has not shown sufficient evidence that any delay in her request for accommodation was unreasonable. Gerton admits that she was able to perform the DA Operator position with one hand, and, it was not until her last day of work on September 21, 2001 that she was unable to use both hands. The district court did not err in finding that, even though Gerton failed to prove a *prima facie* case, Verizon reasonably accommodated Gerton, even though the accommodation was not at the exact time of her request.

III.

**\*\*9** For the reasons set forth above, we affirm the district court's order granting summary judgment in favor of Verizon.

C.A.6 (Ky.),2005.
Gerton v. Verizon South Inc.
145 Fed.Appx. 159, 2005 WL 1994313 (C.A.6 (Ky.)), 2005 Fed.App. 0725N, 31 NDLR P 7

Briefs and Other Related Documents (Back to top)

• 03-6674 (Docket) (Dec. 29, 2003)

END OF DOCUMENT

Briefs and Other Related Documents

This case was not selected for publication in the Federal ReporterNOT RECOMMENDED FOR FULL--TEXT PUBLICATIONSixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.This case was not selected for publication in the Federal Reporter.NOT RECOMMENDED FOR FULL--TEXT PUBLICATION Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 347                                                            Page 27
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))
**(Cite as: 21 Fed.Appx. 347)**

other parties and the Court.   Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)

United States Court of Appeals, Sixth Circuit.
Tina GAYER, Plaintiff-Appellant,
v.
CONTINENTAL AIRLINES, INC.,
Defendant-Appellee.
**No. 00-3887.**

Oct. 2, 2001.

Former employee with lifting restriction resulting from strained shoulder brought state-court action against employer alleging disability discrimination under state law. Employer removed action on diversity grounds. The United States District Court for the Northern District of Ohio granted summary judgment for employer, and employee appealed. The Court of Appeals, R.L. Gilman, Circuit Judge, held that: (1) employer's determination that employee could not continue in her specific job with lifting restriction did not amount to "regarding" employee as disabled under state employment discrimination statute, and (2) lifting restriction was not disability under state statute.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⟨⟩1217**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handicap, Disability, or Illness
      78k1217 k. Practices Prohibited or Required in General;  Elements. Most Cited Cases
(Formerly 78k173.1)
Prima facie case of handicap discrimination under Ohio employment discrimination statute requires showing that employee: (1) was handicapped; (2) suffered adverse employment action, at least in part, because of handicap; and (3) could safely and substantially perform essential functions of job in question. Ohio R.C. § 4112.02(A).

**[2] Civil Rights 78 ⟨⟩1218(6)**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handicap, Disability, or Illness
      78k1218 Who Is Disabled;  What Is Disability
        78k1218(6) k. Perceived Disability; "Regarded As" Claims. Most Cited Cases
(Formerly 78k173.1)
Airline's determination that customer service employee with lifting restriction of 40 pounds could not continue in position since listed job requirements of her position included ability to lift 75 pounds did not amount to "regarding" employee as disabled under Ohio employment discrimination statute, since determination only applied to that position rather than class of jobs or broad range of jobs. 29 C.F.R. § 1630.2(j)(3)(i); Ohio R.C. § 4112.01(A)(13).

**[3] Civil Rights 78 ⟨⟩1218(3)**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handicap,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 347                                                           Page 28
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))
**(Cite as: 21 Fed.Appx. 347)**

Disability, or Illness
    78k1218 Who Is Disabled; What Is Disability
        78k1218(3) k. Particular Conditions,
Limitations, and Impairments. Most Cited Cases
(Formerly 78k173.1)
Airline employee's inability to lift over 40 pounds was
not by itself a disability under Ohio employment
discrimination statute. Ohio R.C. § 4112.01(A)(13).


*347 On Appeal from the United States District Court
for the Northern District of Ohio.

Before DAUGHTREY, GILMAN, and GIBSON, FN*
Circuit Judges.

    FN* The Honorable John R. Gibson, Senior
    Circuit Judge for the United States Court of
    Appeals for the Eighth Circuit, sitting by
    designation.


OPINION

GILMAN, Circuit Judge.
**1 This is an employment discrimination case brought
by Tina Gayer against her former employer,
Continental Airlines, Inc. Gayer alleges that
Continental discriminated against her on the basis of
her disability. The district court granted summary
judgment in favor of Continental. For the reasons set
forth below, we AFFIRM the judgment of the district
court.


I. BACKGROUND

Gayer began working at Continental as a part-time
customer service agent in July of 1991. She strained
her right shoulder in November of 1991 while lifting
luggage. Gayer continued working at Continental and
became a full-time airport sales agent (ASA) on
February 7, 1994. Her particular ASA position
involved staffing the main customer service desk,
checking in customers, and processing customers'
luggage. A number of customer-service positions at
Continental are designated as ASA positions, and
Continental requires that all persons employed in these
positions be able to lift passenger luggage weighing up
to 75 pounds. According to Continental, this lifting
requirement exists because the individuals assigned to
ASA positions must be able to rotate with other ASAs
when required by operational needs.

At the recommendation of her physician, Gayer had
arthroscopic surgery on her right shoulder on May 4,
1998, and remained out of work until June 18, 1998.
Gayer returned to work with the medical restriction that
she not lift or pull more than five pounds. Based on
this restriction, Continental determined that Gayer was
not able to fulfill the essential functions of the ASA
position. It therefore placed her on a 120-day
transitional duty assignment. Transitional duty
assignments are modified assignments that Continental
gives to employees who are temporarily unable to
perform the regular duties of their jobs because of
injuries received while working. The maximum length
of time that Continental allows for such assignments is
120 days.

On October 27, 1998, Continental sent Gayer a letter
informing her that her transitional duty assignment was
due to end on December 1, 1998. The letter notified
Gayer that she was eligible to apply for other positions
at Continental, including ones that accommodated her
medical restrictions, and provided information about
how to do so. Gayer applied for a Young Traveler's
Club position on November 13, 1998, but was informed
that the job was an ASA position for which she was not
qualified because of the lifting requirement.

On December 16, 1998, Gayer's physician stated in
writing that Gayer should not lift more than 40 pounds
in any position. The physician later confirmed that
Gayer's restriction was probably permanent.
Continental concluded, based on this medical
evaluation, that Gayer was unable to return to work as
an ASA. After reaching this conclusion, Continental
sent Gayer several letters and arranged meetings to
discuss positions for which she was qualified.

In early 1999, Gayer applied for a non-ASA position in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 347                                                        Page 29
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))
**(Cite as: 21 Fed.Appx. 347)**

Hub Operations. That position, however, was filled by a candidate whom Continental determined was more *349 qualified. She never applied for any further job openings with Continental.

**2 Gayer filed suit against Continental in the Court of Common Pleas of Cuyahoga County, Ohio on June 9, 1999. Her causes of action were based solely on Ohio law. Continental removed the case to federal court on the basis of diversity of citizenship. On June 20, 2000, the district court granted summary judgment in favor of Continental. This appeal followed.

II. ANALYSIS

**A. Standard of review**

We review de novo the district court's grant of summary judgment. *See, e.g., Holloway v. Brush, 220 F.3d 767, 772 (6th Cir.2000).* Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

**B. Disability discrimination claim**

[1] Gayer alleges disability discrimination under the Ohio anti-discrimination statute, Ohio Revised Code chapter 4112. "To establish a prima facie claim of handicap discrimination under [Ohio Rev.Code § ] 4112.02(A), the person seeking relief must establish

that he or she 1) was handicapped 2) suffered adverse employment action, at least in part, because of the handicap and 3) could safely and substantially perform the essential functions of the job in question." *Miller v. Premier Indus. Corp., 136 Ohio App.3d 662, 737 N.E.2d 594, 599 (Ohio Ct.App.2000)* (citations omitted).

Disability discrimination, according to the Ohio statute, includes discrimination on the basis of either "a physical or mental impairment that substantially limits one or more major life activities" or "being regarded as having a physical or mental impairment." Ohio Rev.Code § 4112.01(A)(13). The Ohio statute was modeled after the federal Americans with Disabilities Act (ADA), and Ohio courts look to the ADA and its interpretation by federal courts for guidance in interpreting the Ohio statute. *City of Columbus Civil Serv. Comm'n v. McGlone, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (Ohio 1998)* ("We can look to regulations and cases interpreting the federal [ADA] for guidance in our interpretation of Ohio law.").

[2] Gayer argues that she falls under the protection of the Ohio handicap discrimination statute because Continental regarded her as being disabled. She points out that Continental's refusal to employ her as an ASA was based upon her inability to lift over 40 pounds. According to Gayer, this action constitutes evidence that Continental regarded her as being disabled. We disagree. For "a covered entity [to] entertain misperceptions about the individual-it must either believe that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)* (holding that the plaintiffs, who *350 were nearsighted job applicants with fully correctable vision, failed to state a claim that the airline regarded them as disabled in violation of the ADA). But Gayer has not demonstrated that Continental is under either misperception.

**3 [3] First, there is no evidence that Continental believed that Gayer had a substantially limiting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Fed.Appx. 347                                                          Page 30
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))
**(Cite as: 21 Fed.Appx. 347)**

impairment that she in fact did not have. Continental did believe that Gayer could not lift over 40 pounds, but Gayer does not dispute this fact. The inability to lift over 40 pounds, however, is not, in and of itself, a disability. Indeed, "[f]ederal case law supports that a maximum weight restriction is not a disability as defined by the ADA." *Law v. City of Scottsdale,* No. 98-6335, 2000 WL 799742, at *4 (6th Cir. June 15, 2000) (unpublished table decision) (holding that the plaintiff, who was under a 40-pound lifting restriction, was not disabled as defined by the ADA, and listing five cases from various circuits, including our own, in which courts have held that weight restrictions alone do not render a plaintiff disabled); *see also McKay v. Toyota Motor Mfg. U.S.A., Inc.,* 110 F.3d 369, 373 (6th Cir.1997) (holding that the plaintiff's inability to engage in "frequent lifting of more than ten pounds ... would not significantly restrict her ability to perform a broad range of jobs in various classes"). Ohio courts have also held that lifting restrictions by themselves do not constitute handicaps. *Sadinsky v.. EBCO Mfg. Co.,* 134 Ohio App.3d 54, 730 N.E.2d 395, 398-99 (Ohio Ct.App.1999) (holding that an employee's inability to lift more than 30 to 40 pounds did not "substantially limit[ ] his ability to engage in ordinary daily activities").

Nor did Gayer show that Continental believed that she had a substantially limiting impairment that was, in fact, not so limiting. The only type of position that Continental regarded Gayer as incapable of holding was the ASA position, for which an individual was required to be able to lift up to 75 pounds so that he or she could substitute for other ASA assignments as required by operational needs. But "an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (citation and internal quotation marks omitted). Instead, the employee must be incapable of, or be regarded as incapable of, "perform[ing] either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

In the present case, Continental presented testimony that there were many other jobs at Continental for which Gayer was qualified despite her lifting restriction, including various administrative and clerical positions that become available "on a routine basis." Continental also sent letters and arranged meetings to inform Gayer about how to apply for such positions. Gayer, in turn, applied for only two jobs. One was the Young Traveler's Club position, an ASA position with the 75-pound lifting requirement, and the other was the Hub Operations Agent position, for which she was not selected because Continental determined that another candidate was more qualified. Consequently, Gayer has not demonstrated that Continental regarded her as disabled.

**\*\*4** Although Gayer alleges that a number of ASA agents were incapable of lifting 75 pounds, she was unable to cite any specific support in the record for this assertion. This issue need not be resolved, however, because Gayer's argument is in effect a challenge to Continental's articulated reason for not reinstating her to an ASA **\*351** position. In effect, she is claiming that Continental's 75-pound requirement is a pretext to mask discrimination. But because Gayer is not disabled or considered by Continental to be disabled (for the reasons stated above), she has failed to make out her prima facie case. We thus have no need to reach the issue of whether Continental's requirement was pretextual.

### III. CONCLUSION

For all the reasons set forth above, we AFFIRM the judgment of the district court.

C.A.6 (Ohio),2001.
Gayer v. Continental Airlines, Inc.
21 Fed.Appx. 347, 2001 WL 1216985 (C.A.6 (Ohio))

Briefs and Other Related Documents (Back to top)

• 00-3887 (Docket) (Jul. 14, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

221 F.3d 1335                                                                                        Page 31
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

**C**
Briefs and Other Related Documents
NOTICE:      THIS   IS   AN   UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter.  Use FI CTA6 Rule
28 and FI CTA6 IOP 206 for rules regarding the
citation of unpublished opinions.)
             United States Court of Appeals, Sixth Circuit.
             Ronald Wayne LAW, Plaintiff-Appellant,
                              v.
        CITY OF SCOTTSVILLE, Defendant-Appellee.
                        **No. 98-6335.**

                       June 15, 2000.

On Appeal from the United States District Court for the
Western District of Kentucky.

Before BATCHELDER and GILMAN, Circuit Judges,
and HOOD, District Judge. FN*

        FN* The Honorable Denise Page Hood,
        United States District Judge for the Eastern
        District of Michigan, sitting by designation.

HOOD, District Judge.
**\*1** Plaintiff Ronald Law appeals from the district court's
entry of summary judgment in favor of his employer,
the City of Scottsville (the City). Law claims he became
disabled after he suffered a back injury while working
as a sanitation worker for the City, and the City violated
the Americans with Disabilities Act (ADA), 42 U.S.C.
§ 12101 et seq., and the Kentucky Civil Rights Act,
Ky.Rev.Stat. § 344.010, et seq., by failing to make
reasonable accommodations for his alleged disability.
Law argues that the district court erred in finding that
he was not disabled as defined by the ADA and that,
even if he were disabled, he was not "otherwise
qualified" for the position of sanitation worker because

he could not perform the essential functions of the job
with or without reasonable accommodations. For the
reasons set forth below, we AFFIRM the judgment of
the district court.

                    I. BACKGROUND

                  A. Factual Background

Ronald Law began his employment as a sanitation
worker for the City of Scottsville on July 21, 1988.
Law's duties included riding on garbage truck routes,
collecting garbage from residential and commercial
sites and loading it onto a garbage truck. On January 4,
1994, Law injured his back while helping six other
workers lift and empty a 55 gallon metal garbage drum
into the back of a garbage truck. Law went to see Dr.
John Hall, who told Law he had pulled a muscle and
prescribed muscle relaxants. Law took a few days off
and then returned to work.

In late January 1994, Law made an appointment with
Dr. V.L. Fisher who ran an MRI and CAT scan. Dr.
Fisher diagnosed Law as having a ruptured disk in his
lower back at the L5-S1 level and prescribed "light
duty" restrictions for his job. Specifically, Dr. Fisher
instructed Law to wear an orthopaedic belt when
working, to not lift more than 40 pounds, and to not
repetitively stoop, bend, or twist. Law did not return to
work and began receiving workers' compensation and
temporary total disability benefits. On April 17, 1994,
Law underwent back surgery. Law believes he fully
recovered from the surgery three months later. Dr.
Fisher did not release Law to return to work until
August 22, 1994, and the doctor continued to restrict
Law from repetitive bending, lifting, and stooping and
lifting more than 40 pounds. The Mayor of the City of
Scottsville, Dell Hall, claimed that Law could not be
transferred to another position because all of the
available municipal jobs required repetitive stooping,
bending, and twisting and lifting more than 40 pounds.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1335                                                                                Page 32
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

Law claims Mayor Hall fired him on December 21, 1994, although the City claims that Law has never been terminated.

On March 22, 1995, Dr. Fisher again stated that Law could return to work with the same restrictions of no lifting weight over 40 pounds, no repetitive bending, stooping, or twisting, and requiring that Law wear an orthopaedic belt. Law claims that he presented this information to Mayor Hall along with some research on ADA guidelines and asked that reasonable accommodations be made for his disability. Law believed that because "Herbie Kirby Lifts" were now being used to assist in lifting 55 gallon metal drums, he could perform the job of a sanitation worker with the accommodation of wearing an orthopaedic belt. The Mayor allegedly refused to discuss Law's employment and told Law that he could not perform the essential functions of a sanitation worker.

**\*2** In a letter dated August 20, 1996, Dr. Fisher indicated that Law could return to work with the only restriction being the 40 pound weight lifting limit and a recommendation that Law wear an orthopaedic belt. On February 13, 1997, Law returned to work for the City as a sanitation worker after the City Council voted to allow him to return.

B. Procedural Background

Law sued the City of Scottsville claiming that the City discriminated against him by failing to make reasonable accommodations for his known disability as required under the ADA and the Kentucky Civil Rights Act. Law also brought a claim pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794. The City moved for summary judgment on each of these claims. Law concurred in dismissing the Rehabilitation Act claim. Accordingly, that claim is not at issue on this appeal. The district court granted the City's motion for summary judgment, ruling that Law was not disabled. The court also held that, even assuming arguendo that Law was disabled, he was not otherwise qualified for the position of sanitation worker because he could not perform the essential functions of the job. This appeal

followed.

II. JURISDICTION

This action was brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Kentucky Civil Rights Act, Ky.Rev.Stat. § 344.010, et seq. The district court had subject matter jurisdiction over the ADA claims pursuant to 28 U.S.C. § 1331 because the case presented a federal question, and it exercised supplemental jurisdiction over the Kentucky Civil Rights Act claim pursuant to 28 U.S.C. § 1367. The district court's entry of summary judgment is a final decision which this court may review pursuant to 28 U.S.C. § 1291.

III. STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir.1996); Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1176 (6th Cir.1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). A "material" fact exists if there is a "dispute over facts that might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

IV. ANALYSIS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1335                                                                                    Page 33
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

**\*3** The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* prohibits an employer from discriminating against an otherwise qualified individual with a disability on the basis of the disability in regards to employment terms, conditions, and privileges. 42 U.S.C. § 12112(a). In order to establish a *prima facie* case of disability discrimination where an employee presents direct evidence of discrimination, the employee has the burden of proving that: 1) he is disabled; 2) he is otherwise qualified for the position despite the disability either a) without accommodation from the employer, b) with the elimination of an alleged "essential" job function, or c) with a reasonable accommodation; and 3) that he was terminated or otherwise subjected to an adverse employment decision because of the disability. *Monette,* 90 F.3d at 1186. The language of the Kentucky Civil Rights Act, Ky.Rev.Stat. § 344.010, *et seq.,* mirrors the language of the ADA, and the analysis under the ADA applies with equal force to the claim brought pursuant to the Kentucky Civil Rights Act. *Brohm v. JH Properties, Inc.,* 149 F.3d 517, 520 (6th Cir.1998). Both claims can therefore be analyzed by reference to the ADA. *Id.*

The first issue on appeal is whether Law was disabled. The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). Regulations promulgated by the Equal Employment Opportunity Commission (EEOC) define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). Law claims his back injury substantially limits the major life activity of working.

An impairment is said to "substantially limit" a major life activity if a plaintiff is:
(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner

or duration under which he or she can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i-ii).

In determining whether a major life activity is substantially limited a court should consider: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); *See also Penny v. United Parcel Serv.,* 128 F.3d 408, 414 (6th Cir.1997).

Specifically, when "working" is the major life activity that is substantially limited,
**\*4** (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). See *McKay v. Toyota Motor Mfg., USA, Inc.,* 110 F.3d 369, 372 (6th Cir.1997). Other factors to consider are:(A) The geographical area to which the individual has reasonable access;
(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1335                                                                                      Page 34
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

29 C.F.R. § 1630.2(j)(3).

Law claims that his back injury constitutes a disability because the injury substantially limits the major life activity of working. In support, Law claims that he has a 35% permanent partial disability, must wear an orthopaedic belt, and cannot lift more than 40 pounds. Law claims this disqualifies him from working in the class of jobs which require heavy duty work. Law does not make any direct arguments as to whether the restrictions on repetitive bending, stooping, and twisting also limit the major life activity of working although Law does argue that the activities are not essential job functions. In deciding that Law was not disabled, the district court found that Law failed to show that he was significantly restricted from a class of jobs or a wide range of jobs. The court found that "the weight of federal case law has held that a maximum weight restriction does not substantially limit an individual's ability to work," and that Law "offer[ed] no evidence as to how the restrictions on repetitive actions restricted him from a whole 'class of jobs.'" The City likewise relies on the weight of federal case law which indicates that maximum weight restrictions are not disabilities. The City also argues that even if weight restrictions could constitute a disability, Law has not shown that his weight restriction has significantly restricted his ability to perform a class of jobs or a broad range of jobs in various classes.

Federal case law supports that a maximum weight restriction is not a disability as defined by the ADA. In *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 348 (4th Cir.1996), a plant worker, who had a 5% permanent partial disability of the back and was restricted from lifting more than 25 pounds and from pushing or pulling heavy objects, brought an ADA claim against her employer. The Fourth Circuit held "as matter of law, that a twenty-five pound lifting limitation-particularly when compared to an average person's abilities-does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." *Id.* at 349. In *Ray v. Glidden Co.,* 85 F.3d 227, 228, 229 (5th Cir.1996), the Fifth Circuit held that a lift truck operator with avascular necrosis which limited him to lifting 5-10 pounds did

not substantially limit the operator's ability to work because he could still lift and reach so long as the item was not heavy. In *Aucutt v. Six Flags Over Mid-America,* 85 F.3d 1311, 1311 (8th Cir.1996), a security guard at an amusement park was diagnosed with angina, high blood pressure, and coronary artery disease, and was restricted to lifting less than 25 pounds. The Eighth Circuit held that a 25 pound weight lifting restriction, without more, was insufficient to show "that his medical condition substantially limited his overall employment opportunities." *Id.* at 1319. In an earlier decision, the Eighth Circuit also held that a ham boner in a grocery store who had carpal tunnel syndrome and was restricted to light duty, with a 10 pound frequent and 20 pound maximum weight lifting restriction, and could not work with meat products or in cold temperatures, was not disabled. *Wooten v. Farmland Foods,* 58 F.3d 382 (8th Cir.1995). The court found that the plaintiff was not substantially limited in the major life activity of working because he was only prevented from working at a narrow range of meatpacking jobs. *Id.* at 386.

**\*5** This circuit has also had opportunity to address the issue of whether a weight restriction renders a person disabled. In *McKay,* 110 F.3d at 370, *aff'g* 878 F.Supp. 1012 (E.D.Ky.1995), an assembly line worker in the body-weld division of Toyota developed carpal tunnel syndrome and was restricted from lifting more than 10 pounds, and told to avoid pushing or pulling, and using vibrating tools. *Id.* Although the employee presented expert testimony that she was unable to perform any medium or heavy duty work, the court held:
In light of the regulatory framework of the ADA, we hold that the physical restrictions caused by plaintiff's disability do not significantly restrict her ability to perform the class of jobs at issue, manufacturing jobs; at best, her evidence supports a conclusion that her impairment disqualifies her from only the narrow range of assembly line manufacturing jobs that require repetitive motion or frequent lifting of more than ten pounds. It follows that her limited impairment would not significantly restrict her ability to perform a broad range of jobs in various classes.

110 F.3d at 373.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1335                                                                                    Page 35
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

Law, like the dissent in *McKay,* argues that according to the EEOC Interpretative Guidance on the ADA, a weight lifting restriction substantially limits a major life activity. The Interpretive Guidance provides the following example:

For example, an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs.

29 C.F.R. Pt. 1630 App. (Interpretive Guidance on Title I of the Americans with Disabilities Act). The dissent in *McKay,* District Judge Douglas Hillman, sitting by designation, criticizes the majority for failing to discuss or explain its disagreement with this Interpretative Guidance example. 110 F.3d at 375, 378. Judge Hillman further faulted the majority for failing to address the EEOC example which interprets what constitutes a "class of jobs," and the nature of the proof a plaintiff is required to present. [FN1] Id. at 378-79. The dissent noted that an employee must present evidence that he is actually disqualified from a class or range of jobs, such as heavy duty, medium duty, or light duty jobs, as opposed to just making reference to the particular job at issue in the case. Id. at 378-79.

   FN1. Judge Hillman admonished that although the EEOC guidelines are not controlling, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," and are "entitled to great deference." Id. (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal citations omitted)). Judge Hillman further quoted from the Supreme Court case of Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.:

   [When] Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if

the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. 467 U.S. 837, 843 (1984).

In this case, it matters not whether this panel follows the majority or dissenting opinion in *McKay* because Law failed to present any evidence that he was disqualified from a class of jobs, and therefore that he was disabled. The relevant time for determining whether the plaintiff is a "qualified individual with a disability" is at the time of the adverse employment decision. *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 884 (6th Cir.1996). According to Law, he was severely injured and now suffers from a 35% permanent partial disability. Law attempts to establish the 35% permanent partial disability by relying on a workers' compensation agreement. No documents presented by Dr. Fisher, Dr. Hall, nor any other doctor establishes a 35% permanent partial disability. Dr. Fisher placed Law's impairment at 12% to the whole body. Dr. Fisher indicated that he instructed Law to wear an orthopaedic belt and not to lift more than 40 pounds. Law was also restricted from repetitive bending, twisting, lifting, and stooping although these restrictions were later removed. There is no evidence showing whether the restrictions on repetitive movement, when imposed, were expected to be of temporary or long term duration, or of permanent impact.

**\*6** Viewing the evidence in the light most favorable to plaintiff, Law has restrictions, but presents no evidence that they are "significant" restrictions on his ability to work as compared to the average person in the general population having comparable training, skills, and abilities. Law fails to show that he is significantly restricted from a "class of jobs" or a "broad range of jobs within a class." Law claims that he is significantly restricted from the "class of jobs" which require heavy labor. The only evidence he presents in support is his own affidavit. No medical records, testimony, or other expert evidence establish that Law is restricted from doing heavy duty jobs, manual labor jobs, other sanitation worker jobs, or even the present sanitation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1335                                                                          Page 36
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))
**(Cite as: 221 F.3d 1335)**

job, nor does the evidence show the number of these jobs, if any, from which Law is restricted. In support of his position that he is significantly restricted from a range of jobs, Law makes much of the fact that unlike the plaintiff in *McKay,* he does not have a college degree, "the key that opens the door to many of the community's jobs." However, during the time in which Law claims he was disabled, he also worked two separate jobs as a bouncer and a security officer. Law also testified that he was not impaired in any other way in his everyday life. At most, Law has established that he is restricted from performing the job of sanitation worker for the City of Scottsville and has not established that he is restricted from a class or range of jobs. Accordingly, Law has failed to establish that he was disabled under the ADA or the Kentucky Civil Rights Act. Having so found, we do not address the issue of whether Law was otherwise qualified for the position.

### V. CONCLUSION

For the reasons set forth herein, we AFFIRM the decision of the district court.

C.A.6 (Ky.),2000.
Law v. City of Scottsville
221 F.3d 1335, 2000 WL 799742 (C.A.6 (Ky.))

Briefs and Other Related Documents (Back to top)

• 98-6335 (Docket) (Oct. 07, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.